FORREST SPIELER, APPELLEE, v. LINCOLN TRACTION COMPANY, APPELLANT.

FILED MARCH 27, 1919. No. 20118.

1. **Trial**: NEGLIGENCE: INSTRUCTION: EVIDENCE. It may be reversible error to submit to the jury, as grounds for recovery, alleged acts of negligence which are wholly unsupported by the evidence.

2. ———: INSTRUCTIONS: QUOTING PLEADINGS. It is generally not commendable practice, in stating the issues to the jury, to quote at large from the pleadings. It may, and frequently does, mislead or prejudice the jury so as to require a reversal.

3. **Street Railways**: INJURY TO CHILD: LAST CLEAR CHANCE. If a street car is moving at about four miles an hour, and is stopping for passengers standing near the track at its stopping place apparently intending to enter the car, it is not proof of negligence under the doctrine of the last clear chance that the motorman saw a five-year old boy running towards a man and woman among such passengers, and assumed that the boy was in their care and would enter the car with them, although the boy was in fact intending to cross the track in front of the car, and ran against, or was struck by, the car and injured.

4. ———: ———: NEGLIGENCE: SUFFICIENCY OF EVIDENCE. It is *held* that the evidence indicated in the opinion was not sufficient proof of the various charges of negligence submitted to the jury.

APPEAL from the district court for Lancaster county: P. JAMES COSGRAVE, JUDGE. *Reversed.*

*F. M Hall, H. W. Baird* and *F. D. Williams,* for appellant.

*Jacob Fawcett* and *Strode & Beghtol, contra.*

SEDGWICK, J.

Forrest Spieler, a boy about five years old, was injured by one of the defendant's street cars so that he

lost his foot and ankle by amputation. His father brought this action in the district court for Lancaster county to recover damages in behalf of the boy. The petition alleged negligence on the part of the defendant in several particulars. The plaintiff, in his brief, in stating the case, says: "It was conclusively shown by the evidence that this boy lost his left leg by the gross carelessness of the appellant in operating a street car over one of the most populous street crossings in the city of Lincoln without a proper brake, or properly using the brake at hand, and without a proper fender as required by a safety ordinance of the city of Lincoln." While the brief discusses other allegations of negligence to some extent, which we will have occasion to mention, we consider that the foregoing are the principal grounds relied upon and call for more particular examination on the part of the court. The accident happened at the crossing of Twelfth and N streets in the city of Lincoln. The defendant operates a street car line on each of these streets, and the car which injured the plaintiff was at the time going eastward on N street. The boy was going north on the east side of Twelfth street to his father's place of business in the next block. The defendant contends that there was no evidence sufficient to support any allegation of negligence on the part of the defendant which was, or could have been, the proximate cause of the injury.

As to the allegation that the car was moving at a negligent rate of speed under the circumstances, it is said and assumed in the briefs of both parties that the car was moving at a speed of four miles an hour; and the plaintiff in his brief says: "This point about the speed is not worthy of lengthy consideration by the court, since there is ample evidence on other matters to sustain the jury's finding of negligence."

The question of negligence on the part of the motorman in failing to warn the boy of his danger is somewhat discussed. There were two persons, a man and

a woman, waiting at the far (east) side of Twelfth street to take passage on this car. Another man was also waiting a short distance farther east for the same purpose. Mr. Schafer, the man nearest Twelfth street, was an important witness for the plaintiff. He was asked, "Did the gong on the street car sound?" while the boy was approaching the track, and answered, "Not that I know of." Another of plaintiff's witnesses who saw the accident testified that the gong was sounded, and he was supported by several witnesses. We do not regard this question as very material, since when passengers were waiting to take the car and it was approaching at about the speed a man would walk, it is incredible that any one would fail to see the car, and it could not be found from this evidence that a failure to sound the gong was the proximate cause of the injury.

Whether the evidence shows that the motorman knew, or ought to have known, that the boy was about to step on the track is considerably discussed in the briefs. The evidence shows that the boy when he was at some considerable distance from the car track, left the sidewalk and picked up some article of interest to him in Twelfth street. He then went immediately toward the car track. Jeffers, one of plaintiff's witnesses, testified as follows: "Q. Did you see the little boy when he—just before he got run over by the street car? A. Yes, sir. Q. And where was he at the time the car struck him? A. You mean when the car struck him? Q. Yes, sir. Where was he at the time the car struck him? A. You mean when the street car struck him? Q. Yes, sir. Where was he in the street? A. Well, he was kind of running on a little bit of a walk, and the car hit him on the southeast corner, or he struck the car. Q. Where was he with reference to the—was he on the crossing going across the street where there is a crossing where people cross the street there? A. Well, just about the east end of the crossing, and maybe a little this side of it. Q. It goes across N street

there? A. Yes, sir. Q. Going across over to the north side? A. Yes, sir. Q. Did you see him as you came up? A. No; I just seen him as he came around the woman or lady who was standing there." *Cross-examination*: "Q. When did you first see this boy? A. Well, when he darted around that lady that was standing there. Q. What is that? A. There was a lady standing there waiting to get on the car, and he came right around that lady. Q. Running? A. I should judge it was on a run. Q. Why didn't you holler to him and call him when you saw that he was going to collide with the car, or the car collide with him? A. Because it happened so quick. Q. How far was he from the car when you first saw him? A. Two or three feet. Q. Which side of the lady did he pass on? A. On the east side. Q. About how far east of the lady? A. Well, not very far. Q. Two or three feet perhaps? A. No; I do not think it was that far. Q. Well, did he stop when he got to the woman or did he just keep going? A. Well, he kind of darted and dodged around there. Q. From behind the woman? A. Yes, sir. Q. He came up from behind the woman, as you say, and dodged around her on her right? A. Yes, sir. Q. And in an instant he was against the car? A. Yes, sir. Q. So quickly you did not have time to holler to him or the motorman? A. Well, just as soon as I saw he was going to hit the car, I hollered at the motorman. Q. But you did not have time to holler before that, it was done so quick? A. No. Q. What would you say in your judgment as to whether or not the motorman could see this child on account of his being so small and so close to the car? A. I would say he could not see him. * * * Q. Did the motorman back up as soon as he was asked to? A. Well, I don't remember just now, but I think he did. Q. Do you know when somebody hollered whether the motorman knew what had happened or not? A. Well, I think, yes, sir; he must have, because he went after that brake wheel pretty hard. Q. Well, do you think he knew who he had struck? A.

Well, I don't know whether he knew what he struck
or not. Q. You think he knew something had hap-
pened? · A. Yes, sir. Q. Could you see the motorman
from where you stood? A. Yes, sir. Q. Well, tell the
jury whether or not when you or somebody hollered, he
instantly applied the brake? A. Well, I seen him go
through the motions of turning that wheel. Q. Well,
did he do that instantly, as soon as some one hollered?
A. Yes, sir. Q. You think the car moved, after some
one hollered, about the length or distance from the
front end of the car to the front of the wheel? A.
Yes, sir. Q. Whatever that may be, whether it is six
·or seven or eight feet? A. Yes, sir. Q. Well, what
would you say from what you saw as to whether or
not the motorman made every effort, as far as you could
see to stop the car as soon as he could? A. I think
he did. Q. Do you know of anything the motorman
could have done to prevent this accident that he did not
do? A. No; I do not know of anything the motor-
man could have done." *Redirect examination*: "Q.
And you saw him (the injured boy) in a position where
he would be struck before he was struck didn't you?
A. No; the way I mean that was where he would have
been—I did not mean that he was struck; he prac-
tically run into the car."

Evidence to the same effect was given by several
other witnesses, both for plaintiff and defendant, and
is not disputed by any. The motorman testified that
he saw the boy as he left the walk, and saw him ap-
proach the track; that he walked toward the man and
woman who were waiting to take passage on the car,
and that he supposed that the boy was in the care of
this woman and was about to take the car with her.
It appears that the boy, instead of stopping with these
intending passengers who were standing very close to
the track, attempted to cross the track in front of the
car. The evidence is conflicting, or perhaps uncertain,
as to just how far he had proceeded when he struck the
car, or the car struck him. He did not fall between the

rails, but his left foot was on the rail and was crushed by the wheel. The motorman testified that he did not see the boy attempt to pass the car. One of plaintiff's witnesses testified that he saw the boy make this attempt, and was asked, "Now, state whether or not there was anything there to prevent the motorman from seeing the boy the same as you did?" and answered, "Not that I know of." This street crossing is much frequented, and this fact and other circumstances required the attention of the motorman, so that it cannot be found from this evidence that the motorman knew, or ought to have known, that the boy was about to attempt to cross the track in front of the car, instead of taking the car with these other intending passengers.

We do not find any evidence in the record justifying the application of the doctrine of the last clear chance, which requires that, when one by his own act causes his injury, the evidence that the conditions were such that the defendant knew, or ought to have known, of the probability of danger to the injured party shall be clear and definite. The evidence in this case will not justify the finding that the motorman knew, or ought to have known, of this boy's intention, or that he failed to use all reasonable efforts to stop the car and prevent the injury. Evidence that the motorman, without leaning forward and "just as he stands," would probably see the track within two feet of the car, under such circumstances, is not applicable. If the motorman was the guardian of this boy and had no other duties to perform, he might, and probably would, have prevented the injury. There is no doubt that the motorman saw the boy coming toward the track as other passengers did who expected to take the car, but there is no evidence that, after the boy had reached the place where other passengers were standing, the motorman saw, or should have seen, any action of the boy indicating that he intended to cross in front of the car. The city ordinance, which is in evi-

dence, is not much different from the common-law rule
in such cases. Without such ordinance the motorman
would be required to use reasonable diligence in
watching for "teams, carriages, persons on foot, and
especially children, either on the track or moving to-
ward it, and on the appearance of danger to such teams
or person or other obstructions, the car shall be stopped·
as promptly as possible." Of course, this does not
mean that all street cars must be stopped when boys
are moving toward the track under all conditions and
circumstances. If that was the rule, a street car would
have difficulty in going across the city. It is only
when such movement presents "the appearance of dan-
ger," and the motorman is not bound to assume that
every one who is walking toward the track will at-
tempt to cross in front of the car. It is not usual to
allow children of five years of age to roam business
streets alone, and it was not unreasonable to suppose
that he was accompanying these intending passengers
and would be cared for by them.

Another claim of negligence on the part of the defend-
ant is that the motorman made no attempt to stop the
car after he realized, or should have realized, that the
boy was in a dangerous position. We have already
indicated that we cannot find that there is evidence in
this case sufficient to justify a reasonable conclusion
that the motorman knew, or should have known, that
this little boy was without protection and was not
accompanying these passengers that were expecting to
enter this car; and it appears that the evidence shows
that the supposition that this child was being cared for
by its parents, and that they were intending to take
him with them upon the car, was not an unreasonable
supposition; and there is no evidence from which it
could reasonably be found that the motorman should
have anticipated that this boy would attempt to run in
front of the car when the car was about to stop; and
he was so near the car that it is doubtful whether he
was struck by the car or himself run against the side

of the car. The evidence is clear that when this happened a witness who saw it shouted to the motorman, and that the motorman immediately applied his brakes, and the car, which was going so slow that it would have stopped of its own lack of momentum in a very short distance, continued to move for about two-thirds of its length at the utmost.

This car was equipped with a hand brake, and it is contended that it was negligence *per se* to operate a car with that style of brake. The evidence shows that some ten years before this accident happened the street car company had purchased a number of cars equipped with hand brakes, and that later, and shortly before this accident, some much larger cars with air brakes had been purchased and were being operated. These larger cars make the longer runs, and the ordinary smaller cars are in a large majority of the cars used by the company. They are known as single-truck cars, and the larger cars are known as double-truck cars. The evidence will not support the conclusion that the air brakes are in any general use anywhere on the smaller single-truck cars, or indeed that they are practicable for use upon such cars. It seems to follow that the evidence fails entirely to show negligence on the part of the defendant in failing to equip this car with air brakes.

There is an ordinance of this city that "It shall be unlawful for any person, firm or corporation to operate any electric street car in or upon any street railway within the corporate limits of the city of Lincoln, unless such car, or in case of trains, the first car, be provided with a fender of the type known as the 'Saginaw fender,' or one equally as efficient." And it is contended that the fender on this car was not a Saginaw fender or one equally as efficient, and that this was the proximate cause of the injury. The evidence shows that the fender was in fact a Saginaw fender, but it is contended that it is not sufficient to show that the fender is of that character, but it "must be in

proper operating condition so as to accomplish the purpose for which it is attached to the street car," and it is claimed that, "if this fender would work, it would be impossible for an accident to happen in the way this accident happened, and if the fender on this car had operated the way it is supposed to operate, the boy's leg would have been saved." We have already seen that it was a doubtful question whether the boy succeeded in getting in front of the car or ran against the side or corner of the car; that is, whether he was in front of the car so that the fender could have worked, or whether he was not. Therefore, the fact that the boy was not taken up by the fender was equally consistent with the contention that he was not in front of the car at all, as it is with the theory that the fender was not a proper fender. There is positive evidence that the fender was a proper fender and was in working condition, and apparently no evidence to the contrary, except a circumstance that the boy was not saved by the fender. Under such circumstances it must be found that there was in fact no evidence from which it could be said that the fender was not a proper fender. Evidence that it might be prevented from working by the motorman, by inserting plugs in certain places, etc., is immaterial, since there is no evidence of any such condition. The evidence is that it was in good working order, and the only thing urged as rebutting that is the fact that it did not save the boy, which tends to prove that the boy was not in front of the car so that he could have been saved by a proper fender. If it is true, as stated in the brief, "that a Saginaw fender in proper condition never fails to operate," then, in the absence of any evidence that this fender was not in proper condition, the fact that it did not operate tends to prove that it had no opportunity to operate, and will not of itself overcome the positive evidence that it was in proper condition.

The evidence is conflicting as to how soon the car could be stopped if the brake was in good condition. Some

of the witnesses testified that it could be stopped within four feet, moving at four miles an hour; and others testified that it would require eight or nine feet. The witness Johnson testified as follows: "Q. And what does it show the distance on the outside, from the southeast corner of the body of the car, back to the center axle of the front wheels? A. It does. Q. And what is that distance? A. Nine feet and seven inches." And plaintiff's witness Liston testified as follows: "Q. State whether or not the car continued to move after it hit the boy? A. Yes, sir. Q. How far? A. Well, I should say probably from the time I saw it, it must have passed from the front end of the car to the wheels, that distance. Q. Do you know whether or not it dragged the boy's foot any distance on the rail, or did you see any of that? A. I believe it did, from the mark of the rail. Q. You saw the marks on the rail? A. Yes, sir. Q. And how far did those marks indicate that the boy had been dragged? A. Not very far; perhaps a foot and a half." This testimony is not contradicted.

Can a motorman, under the doctrine of the last clear chance, be charged with negligence in not stopping his car sooner, if being surprised with a sudden shout of danger, he succeeds in realizing the danger and stopping the car before it moves more than from 10 to 14 feet?

In stating the case to the jury, the court gave a comprehensive instruction reciting many, if not all, of the allegations of the petition in regard to the different alleged grounds of negligence, which would, of course, be erroneous if any of the allegations of negligence were unsupported by the evidence, and following this the court gave instructions on each of the different allegations, submitting them all to the jury. It seems clear that the court also erred in submitting evidence that on some cars at different times the motorman had either maliciously or ignorantly manipulated the fender so that it would not work properly. There

was no evidence that the fender on this car had been so treated.

It is not necessary to discuss the amount of the verdict, although it is complained of as excessive, as it is not presumed that another jury will consider, or even know, the amount of this verdict.

For the various reasons stated, the judgment of the district court is reversed and the cause remanded.

REVERSED. '

DEAN, J., dissenting separately.

It seems that, even though the evidence does conflict, there is sufficient under the rule to sustain the verdict. A few points will be noted.

Motorman Craig who drove the car testified on the part of defendant: "I set the brakes and the car stopped almost immediately. * * * I consider I had my car under perfect control, and had the slack up out of my chain because I was expecting to make a stop, and the car was drifting slowly out so that I made an easy stop." He said he thought the boy "belonged to the lady." He also said: "If I was looking out of the south window of my vestibule from where I stand in the vestibule I would never see a child as small as that, so that if he was within three feet of the corner of the car I could not see him until I knew he was there and looking extraordinary for him. * * * In order to stop a car like that moving, say at four miles an hour, I think a man would make a good stop if he made it between eight or twelve feet." Craig's testimony was discredited by three or four witnesses.

William Schafer testified on the part of plaintiff. He said the lady was at no time between the boy and the approaching car. "Q. Did the boy get on the track? * * * A. Yes, sir. Q. And was he on the track when he was struck? A. Yes, sir; on the first rail; that is the south rail." He said the boy was struck by "the curve of this flange" on the front of the car at a point over the south rail. I made an attempt

to get the boy after the car had struck him, but failed, and the next attempt I made, I caught the boy, but his foot was caught under the wheel. Q. And what did he do? A. Well, I could not pull the boy loose, and I was afraid of pulling his foot off, and so I hollered to the motorman * * * to give me slack, so that I could get the boy's foot loose." He testified that he stepped on the track about two feet in front of the car, and that it ran about ten or twelve feet before it stopped after it struck plaintiff. "Now, what did you do as soon as you got to the boy while he was lying there on the track? A. I picked him up. * * * I held the boy and hollered at the motorman, and waved and tried to attract his attention to get slack, or reverse the car. * * * Q. How far did it move while you had hold of the boy? A. About four feet." On the cross-examination he testified that he saw nothing to indicate that the boy accompanied the woman. That the fender did not drop is not denied.

R. G. Jeffers, called by plaintiff, testified: "Q. Well, where was he (plaintiff) with reference to the south rail? A. Well, he was just by the corner when the car got him. * * * Q. Well, how far did the car go after it struck him? A. About ten feet." He told about the car wheel pushing the boy's foot along the rail. "Q. Do you know when somebody hollered whether the motorman knew what had happened or not? A. Well, I think, yes, sir; he must have, because he went after that brake wheel pretty hard. * * * I seen him go through the motions of turning that wheel. * * * Q. Well, did you see him go around more than once? A. Yes, sir, he went around more than once I think." This evidence of Craig's unusual exertion at the wheel at a place where a slight turn, perhaps a quarter turn or less, would have stopped the car if he had it under control doubtless convinced the jury that he was grossly negligent.

It is obvious that Jeffers' testimony discredits Craig's version of "perfect control" of the car and of

having "the slack up" in his chain and of making "an easy stop." It may well be that, when Craig finally "set the brakes, the car stopped almost immediately." Evidently the wheels slid when the brake was applied because, as Schafer testified, "the wheel never ran over the foot; it just shoved the foot along the rail." If Craig, when he last saw plaintiff "out of the right-hand front vestibule window, and not out of the side window," as he testified, had used reasonable diligence in setting the brakes, it is not likely the boy would have been seriously injured. It is apparent from his own testimony that he saw the boy at the same time and place that Schafer and Jeffers saw him, namely, almost or quite on the south rail just before the car struck him. It was for the jury to determine whether the motorman was using "all reasonable diligence in watching for all  *  *  *  persons on foot, and especially children, either on the track, or moving toward it," as the ordinance provides.

R. C. Liston was called by plaintiff, and testified that he was about fifty feet away, and saw the boy struck by the front of the car "probably about two or three inches to the right of the track," and that the part of the car that struck him was about on a level with the boy's shoulders. From the marks on the rail he believed the boy's foot was dragged about a foot and a half.

Two former motormen testified in substance that without leaning forward an object on the ground can be seen by a motorman within two feet of the front of the car from the place where he stands in the vestibule. They also testified that the car in question when running four or five miles an hour could be stopped within four or five feet if, as Craig testified, the slack was taken up. Defendant's superintendent of transportation made a test of the car in question when it was running "as close as possible to four miles per hour." He testified: "I had the slack taken up in my chain.  *  *  *  I made four tests with car No. 243.

I stopped it from nine to ten and one-half feet." The distance on the outside of the car from the front center of the vestibule to the center of the front axle is eleven feet and ten inches. The front of the platform curves from the center to the corners so that the part that is directly over the track is a little over ten feet from the center of the front axle.

Nearly all of the testimony quoted in the majority opinion is that of Mr. Jeffers. Though called by plaintiff his testimony plainly shows that he was a hostile witness. His cross-examination by defendant as reproduced in the majority opinion appears in a series of leading questions and willing answers. This is mentioned merely because the case seems to be reversed on the ground that the testimony conflicts and that there is not sufficient evidence to support the verdict.

The court instructed the jury on the question of comparative negligence, thus invoking a rule in defendant's interest that is not applicable in a case involving a child under six years of age. 29 Cyc. 560. The jury being so instructed, it will be assumed that, if it found that plaintiff by any negligence of his own contributed to the happening of the accident, the rule was applied by the jury to the facts. Rev. St. 1913, sec. 7892.

Craig says that he saw the boy before the car struck him. The boy was struck by the car platform at a point almost immediately over the south rail. From that part of the platform to the center of the front wheel is a little more than ten feet. In view of the testimony of the former motormen that the car, under the circumstances attendant on this case, could have been stopped in from four to six feet, it seems difficult to escape the conclusion that, if the motorman had used reasonable diligence and care, he could have stopped the car before the wheel reached plaintiff. It would seem that there is sufficient evidence to support the verdict.

MORRISSEY, C. J., and ALDRICH, J., concur in this dissent.